UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - -
514 BROADWAY INVESTMENT TRUST, )
UDT 8/22/05, by and through its )
TRUSTEE, ROBERT A. BLECHMAN, )
   Plaintiff, )
         )
  v.     ) C.A. No. 08-369 S
         )
CRAIG F. RAPOZA; BAINBRIDGE REALTY )
CORP. a/k/a BAINBRIDGE REALTY, )
INC.; PETER P. D'AMICO; )
D'AMICO & TESTA, ATTORNEYS AT LAW, )
P.C.; MICHAEL F. BEHM; HELEN R. )
COUPE d/b/a RE/MAX METRO; MICHAEL )
J. MIALE, SR.; STATEWIDE REAL )
ESTATE APPRAISAL, LLC a/k/a )
STATEWIDE REAL ESTATE APPRAISAL )
CORPORATION and JOHN DOES 1 - 10, )
   Defendants. )
- - - - - - - - - - - - - - - - - - -

OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

This matter is before the Court on the parties' motions for partial summary judgment, pursuant to Fed. R. Civ. P. 56.  This dispute concerns a failed mortgage loan transaction or, as it is described by the parties, a "hard money loan."[1]  Plaintiff 514 Broadway Investment Trust ("Plaintiff" or "the Investment Trust") is based in California, as is its Trustee Robert Blechman, the businessman who found the two investors and formed the Investment Trust with the purpose of engaging in this transaction.  In

---

[1] The parties agree that a so-called hard money loan, as the name implies, is characterized by its short term and high rate of interest.

California, Blechman has worked as a paralegal for a law firm, as a loan officer for a realty services company, and recently, he qualified for a real estate sales license.[2] In a twenty-four count Complaint, Plaintiff has sued all the Rhode Island residents who were involved at the borrower's end of the transaction, including Rhode Island businessman Craig Rapoza; his former real estate investment company, Bainbridge Realty Corp. or Bainbridge Realty, Inc. ("Bainbridge Realty"); Rapoza's lawyer Peter D'Amico; D'Amico's law firm, D'Amico & Testa, Attorneys at Law, P.C. ("D'Amico & Testa"); real estate agent Michael F. Behm; Behm's employer Helen R. Coupe d/b/a Re/Max Metro; real estate appraiser Michael J. Miale, Sr.; Miale's employer Statewide Real Estate Appraisal, LLC, a/k/a Statewide Real Estate Appraisal Corporation ("Statewide"); and John Does 1-10. For the reasons outlined below, the Court holds that some of these claims may proceed to trial, while others must be dismissed as a matter of law.

I.  Standard of Review

When ruling on a motion for summary judgment, the Court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. <u>Cont'l Cas. Co. v. Canadian Univ. Ins. Co.</u>, 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be

_____

[2] Blechman also characterizes himself as a "professional poker player."

granted if there is no issue as to any material fact, and the moving party is entitled to judgment as a matter of law. The ultimate burden of persuasion is on the moving party to show that the undisputed facts entitle it to summary judgment as a matter of law. Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir. 1989). The moving party must show that "there is an absence of evidence to support" the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If that burden is met, the nonmoving party cannot rest on its pleadings but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

II. Background

The Court summarizes the background of this case, supplying more specifics as it addresses in turn the counts against each Defendant. All of the facts recited herein are undisputed unless otherwise noted, or are stated in a manner drawing all reasonable inferences in favor of the nonmoving party.

In August 2005, Plaintiff Investment Trust agreed to loan Defendants Craig Rapoza and Bainbridge Realty the sum of $800,000. Rapoza was in a hurry to obtain funds in order to remove from bankruptcy a business that he partially owned, radio station operator Cumbre Communications Corp. ("Cumbre"). Plaintiff's loan

was to be secured by a first mortgage on property owned by Bainbridge Realty at 514 Broadway in Providence, Rhode Island. This historic residence, built in 1867, was recently described in the local newspaper as an "ornate West Side mansion, in disrepair for decades."[3]

Rapoza retained an attorney, Defendant Peter P. D'Amico, to prepare the mortgage and loan documents. Blechman asserts, and D'Amico denies, that D'Amico also agreed to serve as attorney for the Investment Trust. Blechman explains that he requested, received, and relied upon advice from D'Amico concerning all aspects of the loan transaction, including the legality of the loan's interest rate and the clarity of the property's title, as well as non-legal matters such as Rapoza's financial solvency and character, and the value of the collateral. While admitting that he served as closing agent on the loan, D'Amico denies that Blechman sought or relied on his legal advice and denies that he discussed the value of 514 Broadway with him. The parties agree that the Investment Trust sought no independent assurances of Rapoza's financial situation, such as a credit report or loan application, prior to the loan's closing.

As additional collateral for the loan, Rapoza agreed to provide an assignment of his interest in two contiguous parcels of real property in Burrillville and North Smithfield, Rhode Island,

---

[3] The Providence Journal, January 30, 2011.

owned by Cumbre ("the Cumbre property").  Plaintiff alleges that D'Amico's misfeasance in recording this assignment resulted in Plaintiff's receiving no, or only partial, value for the assignment.

Before the loan's closing, Blechman reviewed a property appraisal for 514 Broadway that had been prepared for Rapoza by Defendant Michael J. Miale Sr. in August 2005.  The accompanying cover letter from Miale to Rapoza set forth a potential value for the property of between $1.1 and $1.3 million, "depending on use and finish," and made several references to the building's need for "renovation both interior and exterior."  Neither Blechman nor any other member of the Investment Trust obtained an independent appraisal, visited 514 Broadway, or reviewed the property's tax assessment prior to the loan's closing.

Prior to the closing, Blechman also had an opportunity to review a marketing proposal generated for Rapoza by realtor Defendant Michael Behm in August 2005, which stated that the 514 Broadway property could be marketed for over $1 million.  Behm's employer Helen R. Coupe d/b/a Re/Max Metro was also named as a Defendant in the lawsuit; however, both Behm and his employer were dismissed from the lawsuit by stipulation on June 14, 2010, thereby retiring Counts XV - XIX.

On October 7, 2005, Rapoza, individually and on behalf of Bainbridge Realty, executed the "Balloon Promissory Note Secured by

Mortgage, Deed of Trust or other Security Deed on Real Property" ("the Note"). According to the Note's terms, Rapoza and Bainbridge Realty agreed to pre-pay two monthly 18% interest payments totaling $24,000, as well as $80,000 in lender origination fees. Thereafter, Rapoza was to make four more monthly interest payments of $12,000, and an $800,000 balloon payment six months later, at the end of the loan's term. Also on October 7, 2005, Rapoza executed the $800,000 mortgage on 514 Broadway in favor of the Investment Trust. Following the closing, the Investment Trust deposited $696,000 into an escrow account held by D'Amico. Rapoza and Bainbridge Realty made a single payment on the Note of $12,000 in January 2006.

In September 2006, Bainbridge Realty filed for Chapter 11 in Rhode Island's Bankruptcy Court. Attorney D'Amico, on behalf of Bainbridge Realty, petitioned the Bankruptcy Court to void the Note, based on the argument that its interest rate, along with the costs and fees, constituted usury under Rhode Island law. Concluding that it was indeed usurious, the Bankruptcy Court reformed the Note to comply with the law, in accordance with a usury savings clause that Blechman had requested be included in the Note. On June 18, 2007, the Bankruptcy Court issued an Order

approving a payoff from Bainbridge Realty to the Investment Trust
of $975,806.70.[4]

With permission of the Bankruptcy Court, the Investment Trust
foreclosed on 514 Broadway, then bought it at a May 2007
foreclosure auction. Plaintiff claims to have then found a buyer
for the property who offered $450,000 but backed out of the deal
when a title search revealed unresolved issues. Ultimately, the
title was affirmed. While the fact is in no way essential to the
outcome of this lawsuit, Plaintiff has since sold the property for
$210,000 to Community Works Rhode Island, which plans to convert
the structure into condominiums with the assistance of the
Providence Preservation Society, according to the _Providence
Journal_ article cited earlier. III.    Analysis

A.    Claims against Defendants Craig F. Rapoza and Bainbridge
      Realty

Plaintiff has moved for partial summary judgment on four of
the eight counts against Defendants Craig F. Rapoza and his company
Bainbridge Realty. These counts include claims of breach of
contract and book account actions against each defendant.[5] Rapoza
has not objected to Plaintiff's motion for summary judgment on
these counts. Bainbridge Realty has failed to plead or otherwise

---

[4] This amount includes the balance on the principal, finance
charges, and legal fees, as of February 27, 2007.

[5] Plaintiff has additional counts against Rapoza for negligent
misrepresentation, fraud, deceit, and civil conspiracy, on which no
party has moved for summary judgment.

defend itself in this lawsuit, and was defaulted on November 3, 2008. In connection with these claims, Plaintiff seeks $1,506,357.32 on the Note, and reasonable attorneys' fees to be established by affidavit. This amount represents the payoff figure entered by the Bankruptcy Court as of February 2007, plus additional finance charges calculated through October 2010. As these amounts are undisputed, the Court accepts them in accordance with Fed. R. Civ. P. 56(e)(2), and grants summary judgment in favor of Plaintiff on these four counts, pursuant to Fed. R. Civ. P. 56(e)(3).

      B.    Claims against Defendants Michael J. Miale, Sr. and Statewide

Plaintiff asserts four counts against real estate appraiser Michael J. Miale, Sr. for negligent misrepresentation, fraud, deceit, and civil conspiracy, and one count for vicarious liability against Miale's employer Statewide. Specifically, Plaintiff alleges that Miale negligently or intentionally "grossly overstated the value of the subject property [514 Broadway], and his practices and methodology exceeded all bounds of reasonably accepted practices and methods used in the industry." (Compl. ¶ 203.) Miale and Statewide have filed a joint motion for summary judgment on all the counts against them. Plaintiff has objected.

In their memoranda, Miale and Plaintiff both extensively debate various legal theories, such as the economic loss doctrine, contractual privity, and assumption of the risk, and they address

certain factual issues at length, such as what was or was not said in a telephone call between Blechman and Miale, how promptly Miale recollected that phone call several years later when he was deposed, and whether or not Miale's appraisal conformed to industry standards as set forth in the Uniform Standards of Professional Appraisal Practice. All of this seems to the Court largely inapposite, irrelevant, or, at least, beside the point.

The appraisal and the accompanying cover letter, which are the centerpieces of Plaintiff's allegations, were prepared by Miale for Rapoza before Rapoza and Plaintiff were in contact. Both documents are couched with conditions, 'howevers,' 'ifs,' and other verbal red flags. For example, the cover letter, while extolling the building's unique and ornate Victorian architectural features, points out twice that the building is in need of renovation both inside and out. The final paragraph, which includes the valuation considered false and misleading by Plaintiff, states:

> Utilizing a cost per sf at the low end of $178.00 the subject would warrant an estimated market value of $979,000. After considering the size, detail and appeal of the subject, as well as the large lot size for the area, we are of the opinion that the subject property would warrant an estimated market value in the range of $1.1-1.3 million dollars depending on the use and finish. This appraisal is based on the information provided by the owner including information on the reconfigured lot size.

Letter from Miale to Rapoza (Aug. 1, 2005), Def.'s Ex. C in Sup. Of Mot. for Summ. J., ECF No. 109. The appraisal itself, a form attached to the cover letter, continues in the same tone, with

several disclaimers and cautionary notes, such as on the first page:

> The exterior needs maintenance.  The kitchen has been gutted.  Several rooms partly gutted in various stages of renovation.    Overall    interior    and    exterior maintenance/renovation needed. . . . The appraiser did not conduct a structural inspection.

Appraisal, Aug. 1, 2005, Def.'s Ex. C in Sup. of Mot. for Summ. J., ECF No. 109.

The tort of negligent misrepresentation requires a finding of the following elements:

> 1) a misrepresentation of a material fact; 2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; 3) the representor must intend the representation to induce another to act on it; and 4) injury must result to the party acting in justifiable reliance on the misrepresentation.

Mallette v. Children's Friend & Serv., 661 A.2d 67, 69 (R.I. 1995) (citation omitted).

On these facts, it cannot be said that Miale or Statewide made misrepresentations of material fact; instead, they expressed a conditional assessment of the property's potential value.  For example, Miale's million-dollar valuation depends on "use and finish."  His ensuing description of the house in need of maintenance inside and out, with several rooms gutted and in various stages of renovation, conveys clearly to the reader that this "finish" has not yet taken place.

In his deposition, Blechman testified that, after he received the appraisal, he telephoned Miale to discuss it with him further. In these calls, Blechman claims, but Miale denies, that Miale affirmed his valuation. Both parties recall that Miale urged Blechman to: "Read the appraisal." Blechman interprets this directive as an invitation to rely on Miale's valuation, but it seems more logical that Miale did not want to be pressed to elaborate on or contradict his appraisal, whose words and phrases had no doubt been carefully chosen.

Plaintiff also argues that Miale's appraisal does not conform to industry standards for professional appraisers. This argument has no legs. Plaintiff did not hire Miale, and Miale had no relationship with Plaintiff. If Plaintiff believed his work product was deficient, Plaintiff could have retained its own appraiser prior to the loan's closing, as any reasonable purchaser would have done. Indeed, it appears that Plaintiff deliberately did not take this prudent step because it did not want to receive contrary information. Whatever the reason, there is nothing on the face of the appraisal to indicate that it professed to be anything other than what it was. Miale made no misrepresentation, negligent, intentionally, or otherwise, to Plaintiff. Consequently, the Court grants summary judgment in favor of Miale and Statewide on Counts XX - XXIV.

C.    Claims against Defendants Peter D'Amico and D'Amico &
      Testa

Plaintiff alleges that Attorney D'Amico committed the torts of negligent misrepresentation, fraud, legal malpractice, and deceit against Plaintiff Investment Trust.  Plaintiff also alleges that D'Amico engaged in a civil conspiracy to commit the intentional torts, along with Defendants Craig Rapoza, Michael Behm, Michael Miale, and John Does 1-10.  D'Amico has moved for summary judgment for the claims against him, with the exception of Count III for legal malpractice, because the issue central to that count, i.e., whether D'Amico entered into an attorney-client relationship with Plaintiff, is disputed.  Plaintiff has objected to D'Amico's motion.  No party has moved for summary judgment on Count VI against D'Amico & Testa for vicarious liability.

1.    Negligent Misrepresentation

In the Complaint, Plaintiff alleges that Defendant Attorney D'Amico made negligent misrepresentations in six distinct areas of their communication and dealings: "the value and condition of the property, the historic condition of the property, the state of title with respect to the subject property, Rapoza's ability to repay the proposed loan and his standing in the community, and with respect to the state of the law in the State of Rhode Island with

respect to usury, as well as with respect to Rapoza's interest in Cumbre Communications Corporation."[6]  (Compl. ¶ 81.)

Although generally a lawyer owes no duty of care to an adverse party, third party, or other non-client, the Rhode Island Supreme Court recently determined that an exception should be made in cases where a lawyer and her client intend their transaction to benefit a third party. Credit Union Central Falls v. Groff, 966 A.2d 1262, 1272 (R.I. 2009).  The circumstances in Groff, similar to the present circumstances, involved a real estate transaction, where the lawyer was retained by the borrower to conduct the closing so as to effectuate the shared goals set forth in the contract between the third-party lender and the borrower.  Id. at 1273.  In evaluating the lawyer's conduct, the Rhode Island Supreme Court held that the lawyer's duty of care must be measured by professional standards, that is, the lawyer must "use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." Id. at 1272 (internal citation omitted).  As the Court articulated its new rule, it emphasized the rule's "narrow scope," id. at 1271, distinguishing its ruling from other jurisdictions which "have embraced a broader foreseeability

---

[6] For purposes of analyzing this count, the Court assumes that no attorney-client relationship existed between Plaintiff and D'Amico, so that this count sets forth an alternative claim to Plaintiff's claim for legal malpractice.

approach to determine an attorney's duty of care to a nonclient," and refraining from extending the exception as far.  <u>Id.</u> at 1272 n.12.

A plaintiff must provide expert evidence in order to demonstrate that an attorney has failed to employ the level of professional skill and diligence used by lawyers of ordinary skill and capacity.  In <u>Cronan v. Iwon</u>, 972 A.2d 172, 175 (R.I. 2009), the Rhode Island Supreme Court held that, "[a]s with negligence-based legal malpractice claims, expert evidence is required to establish the appropriate fiduciary duties owed by the attorneys unless such duties are a matter of common knowledge."

According to Plaintiff, Defendant D'Amico made three representations which misled and induced the Investment Trust to enter into the loan transaction, and three other misrepresentations that sabotaged the ostensible goals of the loan transaction and resulted in Plaintiff's financial losses.  The Court takes them in turn.

a)   The Value and Condition of the Property

Blechman asserted in an affidavit that he asked D'Amico about the accuracy of Miale's appraisal and that "D'Amico indicated to me that that valuation was reasonable for the 514 Broadway property." (Blechman Aff. ¶ 59, Dec. 15, 2010, ECF No. 152.)

b)   The Historic Nature of the Property

In his affidavit, Blechman states, "D'Amico indicated to me
that he had been to the property, that it was a historical property,
that it was in good condition, and that it was a valuable local
historical landmark."  (Id. ¶ 60.)

c)   Rapoza's Ability to Repay the Loan and His Standing
     in the Community

Blechman states that he asked D'Amico about Rapoza and that
D'Amico stated "he was a man of means," "of good reputation and
character and would be unlikely to default."  (Id. ¶¶ 61, 62.)

According to Blechman, all of these assurances turned out to
be untrue.  However, even if D'Amico did make these statements,[7] and
regardless of their truthfulness, these statements cannot form the
basis of a negligent misrepresentation claim for several reasons.
First, these statements are outside the realm of D'Amico's duty and
expertise as a closing attorney.  Under Groff, D'Amico's duty to
non-client Plaintiff is limited to those actions for which Plaintiff
is a "direct and intended beneficiary" of D'Amico's transaction with
his client, Rapoza.  966 A.2d at 1273.  As the Court reads Groff,
the conduct subject to potential liability would be limited to the
lawyerly activities involved in closing the loan and would not
include preliminary conversations even on related topics.   In

---

[7] For the purposes of his summary judgment motion, D'Amico
does not dispute that he made these statements, or similar
statements.

-15-

addition, Plaintiff has produced no evidence that D'Amico's alleged statements were false: that the appraisal was inaccurate; that the building is not a historic landmark; or that Rapoza was not "a man of means."

Finally, Plaintiff's reliance on these statements as the basis for its business decision-making is not reasonable; in fact, it is barely credible. Plaintiff had in its possession a real estate appraisal prepared by a professional appraiser, as well as a marketing proposal prepared by a real estate broker. It would not have been reasonable for Plaintiff to rely on the closing attorney as the guarantor of the collateral's value and historic nature. As for Rapoza's financial well being, Blechman testified in his deposition that Plaintiff was unconcerned with Rapoza's creditworthiness. Blechman explained that Plaintiff did not think it necessary to get a credit report because they already knew that Rapoza had "lousy credit" and that Cumbre's bankruptcy was the impetus for Rapoza's need for cash. (Def. D'Amico's Statement of Undisputed Facts 18, ECF No. 107.) The investors were not particularly concerned about Rapoza's creditworthiness, Blechman continued, because they were confident the collateral adequately secured the loan. Consequently, there is no basis to find that Plaintiff relied on assurances D'Amico made concerning Rapoza's financial status. Finding that D'Amico made no negligent misrepresentations in connection with the first three topics,

summary judgment must be granted in D'Amico's favor with respect to the representations concerning the value and historic quality of 514 Broadway and Rapoza's character and financial status.

The next three areas of representations allegedly made by D'Amico include: the state of the title on 514 Broadway; whether or not the mortgage's interest rate conformed to Rhode Island law; and the secondary collateral in the Cumbre property. These areas require more scrutiny because they bear directly on the loan transaction and, consequently, trigger the duty of professional care D'Amico owed to Plaintiff under <u>Groff</u>.

> d)    Title for 514 Broadway

Prior to the mortgage loan closing, D'Amico prepared a Preliminary Report of Title on 514 Broadway which indicated that the title was clear, except for two mortgages which were to be discharged prior to the closing. In his affidavit, Blechman states that Plaintiff "relied on the Preliminary Report of Title prepared by D'Amico in deciding to enter into the loan transaction." (Blechman Aff. ¶ 40.) However, Plaintiff alleges that a number of new and significant issues with the title were revealed by a title company after Plaintiff foreclosed on the property and attempted to market it. These additional title problems were outlined in a "Commitment for Title Insurance" prepared by LandAmerica Lawyers Title for Jahan Montague, dated April 4, 2008. (ECF No. 153-31.) As a precondition for the issuance of a title policy, LandAmerica

Lawyers Title required proof of the discharge of five tax liens and eight additional mortgages, as well as various judgments, <u>lis pendens</u>, and other so-called "matters of record." Because of these issues, Plaintiff alleges that it lost the potential purchaser. Plaintiff states that it would not have entered into the loan transaction had it known of the issues with the title.

D'Amico admits that he did prepare the Preliminary Report of Title and that he told Plaintiff it was reliable. D'Amico argues that the fact that Plaintiff was able to secure a first priority mortgage and was later able to foreclose on the property indicate that his title report was accurate. Furthermore, D'Amico asserts that Plaintiff made a claim against the title company after the alleged buyer backed out, and the title company affirmed the title, rather than paying the claim. D'Amico argues that this demonstrates that the title was clear and marketable.

The preparation of the title comprises part of the loan transaction and falls within the gambit of <u>Groff</u>'s duty to a third-party beneficiary. Although Plaintiff has not proffered expert testimony to establish the proper standard of care as required by <u>Cronan v. Iwon</u>, the Court holds that it is within the realm of common knowledge that a clean and marketable title is a cornerstone of a real estate transaction. There is a genuine dispute between the parties concerning the marketability of the title and the accuracy of D'Amico's title report. Consequently, the Court denies

D'Amico's motion for summary judgment on this portion of Plaintiff's Count I.

        e)    Rhode Island's Usury Rate

The next area of misrepresentation concerns the interest rate included in the mortgage loan.  At his deposition, Blechman testified that he specifically asked D'Amico about Rhode Island's usury rate and whether the loan's terms would violate the statute. In his affidavit, Blechman states, "D'Amico advised me that the terms of the loan, as reflected in the final loan documents, did not violate Rhode Island usury prohibition."  However, after Bainbridge Realty declared bankruptcy, D'Amico argued to the Bankruptcy Court that the loan's terms were usurious and that the entire transaction should be void.  The Bankruptcy Court agreed that the loan's terms were usurious.

D'Amico argues that there is no evidence to show that he ever represented that the terms of the loan complied with Rhode Island's usury statute.  Moreover, even if he made such a representation, D'Amico argues that Plaintiff did not rely on it, because the inclusion of the usury savings clause, at Blechman's suggestion, ensured the enforceability of the loan.

As the closing attorney on the loan, D'Amico's duties included preparing an enforceable contract, with agreed-upon terms.  Because of the savings clause, the contract was reformed and rendered enforceable by the Bankruptcy Court.  The contract itself did not

conform to Rhode Island law, despite D'Amico's alleged assurances to the contrary. Expert testimony is not required to understand that a closing attorney is obligated to produce an enforceable contract; this is common knowledge. Consequently, Plaintiff has produced sufficient evidence to demonstrate a genuine issue for trial in connection with this single representation, and the Court accordingly denies D'Amico's motion for summary judgment on this portion of Plaintiff's claim.

f) Cumbre Property

Plaintiff also claims that D'Amico's negligent misrepresentations prevented it from receiving an assignment of Rapoza's interest in the Cumbre property, which was to serve as additional collateral for the loan. According to Plaintiff, D'Amico's initial version of the documents assigned Rapoza's interest in his "40% interest in Cumbre, limited to the real property." Blechman asked D'Amico to revise the documents because he felt that they understated Rapoza's interest in Cumbre. D'Amico complied. However, according to Plaintiff, D'Amico recorded the first version of the assignment in the North Smithfield town office and the revised version in Burrillville. Then, Blechman states in his affidavit, D'Amico recorded a new and different version, assigning the "proceeds" of Rapoza's mortgage to Plaintiff, in both North Smithfield and Burrillville. According to Plaintiff, this rendered the documents "unenforceable."

D'Amico asserts that he never discussed the value of the Cumbre property with Plaintiff and that his activities in connection with recording the mortgages were consistent with his understanding of the deal between Rapoza and Plaintiff. In addition, D'Amico points out that Plaintiff reviewed the Cumbre property assignments prior to releasing the loan funds.

It is unclear to the Court what actually happened in connection with the recording of these assignments, but it is clear that Plaintiff has veered out of the territory of 'common knowledge' with these allegations. Plaintiff has failed to produce adequate evidence, expert or otherwise, to demonstrate that D'Amico violated the norms of professional competency and skill in connection with the Cumbre property collateral. Consequently, the Court grants D'Amico's motion for summary judgment on this portion of Count I.

2. Fraud and Deceit

In Count II for fraud, Plaintiff alleges that D'Amico made the same six representations discussed in connection with Count I, with knowledge that those representations were false. An action for common-law fraud, or deceit, requires a showing of a false statement of fact, not an opinion or estimate, knowingly made, which the plaintiff can show he or she justifiably relied and acted upon. Fournier v. Fournier, 479 A.2d 708, 714 (R.I. 1984); E. Providence Loan Co. v. Ernest, 236 A.2d 639, 642 (R.I. 1968). An attorney owes a duty, even to an adverse party, not to participate in fraud or

malicious conduct.  Nisenzon v. Sadowski, 689 A.2d 1037, 1046 (R.I. 1997).

In order to establish that a false statement was made knowingly, with the intent to defraud, a plaintiff must produce sufficient evidence for a reasonable inference of such intent to be drawn.  State v. Letts, 986 A.2d 1006, 1012 (R.I. 2010); Jamestown Bridge Comm'n v. Am. Empl'rs' Ins. Co., 128 A.2d 550, 552 (R.I. 1957).  Intent to defraud may be inferred by the factfinder based on the totality of the circumstances.  Palmacci v. Umpierrez, 121 F.3d 781, 789 (1st Cir. 1997) (applying traditional common law in a review of a ruling of the Bankruptcy Court) (citing In re Anastas, 94 F.3d 1280, 1286 n.3 (9th Cir. 1996); In re Sheridan, 57 F.3d 627, 633 (7th Cir. 1995)).

As discussed above, Plaintiff has failed to present sufficient evidence to establish that D'Amico's alleged representations on the accuracy of the appraisal, the historic nature of the property, and Rapoza's financial status were false.  There is no need for further examination of D'Amico's statements on these topics.  Likewise, the assignment and recording of the secondary collateral in the Cumbre property requires no discussion because Plaintiff's allegations in this area fail to provide the quantum of proof necessary to demonstrate that there is a genuine issue for trial.

The two allegations that remain are the legality of the loan terms and the clarity of 514 Broadway's title at the time of the

loan's closing.  For these allegations to support a claim of fraud, Plaintiff must show that D'Amico made these representations knowingly, with the intent to defraud, or Plaintiff must produce sufficient evidence from which a reasonable inference of such intent may be drawn.

Plaintiff alleges that D'Amico assured him that the interest rates and fees set forth in the Note complied with Rhode Island law when, in fact, they did not.  Moreover, when Bainbridge Realty declared bankruptcy, D'Amico argued to the Bankruptcy Court that the Note was void because of its usurious rates.  While Plaintiff lacks direct proof of D'Amico's intent, these circumstances create a reasonable inference that D'Amico knew the rates were usurious when the Note was drawn up.  Consequently, summary judgment must be denied on this portion of the fraud claim.

D'Amico prepared and signed a Preliminary Report of Title as of August 19, 2005 and faxed it to Blechman a few days later.  The Report included the two mortgages on the 514 Broadway property that the parties had agreed would be discharged before closing.  On April 4, 2008, LandAmerica Lawyers Title company identified eight additional unresolved issues with the title.  Given D'Amico's status as the closing attorney for the mortgage for 514 Broadway, the discrepancies between the two title reports create a reasonable inference that D'Amico knew of the omissions in his Preliminary Report of Title when he prepared and sent it to Plaintiff.

Therefore, this allegation also raises a genuine issue for trial, and summary judgment in D'Amico's favor on this matter must be denied.

In a separate count, Plaintiff alleges that D'Amico committed the tort of deceit in connection with the same representations discussed previously. To establish the tort of deceit, a plaintiff must show that the defendant made a false statement, knowing it to be false, with the intention to deceive and induce the plaintiff to rely on the statement to his or her detriment. <u>Francis v. Am. Bankers Life Assurance Co. of Fl.</u>, 861 A.2d 1040, 1046 (R.I. 2004); <u>Katz v. Prete</u>, 459 A.2d 81, 84 (R.I. 1983). In these circumstances, this tort is indistinguishable from the previously-pled fraud claim, as are the allegations forming the basis of the claim. Consequently, because it is unnecessarily duplicative, D'Amico's motion for summary judgment on this count is granted, pursuant to Fed. R. Civ. P. 56(f)(2).

### 3. Civil Conspiracy

Plaintiff alleges that D'Amico "worked together with Defendants Rapoza, Behm and Miale and John Does 1-10, or some of them, to intentionally misrepresent information to Plaintiff with the intent to induce Plaintiff to enter into the subject loan transaction." (Compl. ¶ 109.) To establish a civil conspiracy, Plaintiff needs evidence of an agreement between two or more parties to commit an intentional tort or other unlawful act. <u>Read & Lundy, Inc. v.</u>

<u>Washington Trust Co. Of Westerly</u>, 840 A.2d 1099, 1102 (R.I. 2004).

Plaintiff's evidence may demonstrate the existence of the agreement or "facts from which the existence of such an agreement reasonably could be inferred." <u>Smith v. O'Connell</u>, 997 F. Supp. 226, 241 (D.R.I. 1998). The Rhode Island Supreme Court has held, in the criminal context, "[b]ecause it is difficult to prove in complete detail the explicit terms of conspiracy agreements, the goals of the conspirators 'may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties.'" <u>State v. Mastracchio</u>, 612 A.2d 698, 706 (R.I. 1992) (quoting <u>State v. Gordon</u>, 508 A.2d 1339, 1349 (R.I. 1986)).

As discussed above, Plaintiff has presented sufficient evidence to reach a jury on some of his claims, including the intentional tort of fraud. In order to avoid summary judgment on the civil conspiracy count, Plaintiff must also demonstrate that there was an agreement between D'Amico and someone else to carry out the fraud. Plaintiff has presented no evidence of any agreement between D'Amico and Miale, Behm, or any John Doe. In fact, there is little or no evidence that D'Amico even knew these other defendants. However, Plaintiff has alleged a significant, long-standing relationship between D'Amico and Rapoza. In fact, Plaintiff has made allegations concerning prior fraudulent and criminal transactions involving both D'Amico and Rapoza. On his part, D'Amico vehemently denies that he

conspired with Rapoza.  The Court takes no position on these claims but only notes that a dispute exists.

D'Amico's alleged assurances made to Plaintiff concerning the value of 514 Broadway and Rapoza's financial solvency and good character, while not actionable as misrepresentations, nonetheless reflect D'Amico's eagerness to see the mortgage loan transaction completed.  These circumstances, taken together with the allegations concerning the usury rate and the title, give rise to a reasonable inference that an agreement existed between D'Amico and Rapoza to induce Plaintiff to enter into the mortgage loan transaction. Consequently, the Court denies D'Amico's motion for summary judgment as to Count V for civil conspiracy.

IV.  Conclusion

For all of the reasons set forth above, the Court rules and records the disposition of all claims as follows:

**Count I** – Negligent misrepresentation as to Peter D'Amico.

Summary judgment is granted in Defendant D'Amico's favor on the portion of the count that concerns claims made about the value and historic nature of 514 Broadway, the character and financial status of Craig Rapoza, and the recording of the mortgages on the Cumbre property.  Summary judgment is denied on the portion of the count that concerns claims made about the usury rate in the Note and the title for 514 Broadway.

**Count II** – Fraud as to Peter D'Amico.

Summary judgment is granted in Defendant D'Amico's favor for the same claims as in Count I; and it is denied for the same claims as in Count I.

**Count III** – Legal malpractice as to Peter D'Amico.

No motion has been made.

**Count IV** – Deceit as to Peter D'Amico.

Summary judgment is granted in Defendant D'Amico's favor.

**Count V** – Civil Conspiracy as to Peter D'Amico.

Summary judgment is denied.

**Count VI** – Vicarious liability as to D'Amico & Testa.

No motion has been made.

**Counts VII, VIII, IX and X** – Breach of contract as to Craig Rapoza and Bainbridge Realty; Book accounts as to Craig Rapoza and Bainbridge Realty.

Summary judgment is granted in favor of Plaintiff.

**Counts XI, XII, XIII, XIV** – Negligent misrepresentation, fraud, deceit and civil conspiracy as to Craig Rapoza.

No motion has been made.

**Counts XV, XVI, XVII, XVIII and XIX** – Claims against Michael F. Behm and Helen R. Coupe d/b/a ReMax Metro.

All counts dismissed by stipulation.

**Counts XX, XXI, XXII, XXIII and XIV** – Claims against Michael J. Miale, Sr. and Statewide Real Estate Appraisal Corp.

Summary judgment is granted in favor of Defendant Miale and Defendant Statewide on all counts.

No judgments shall enter in this case until all claims are resolved. In addition, no interim award of attorneys' fees will be made.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Dated: September 7, 2011